**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| GRINGITA, LTD., | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No.  SA-25-CA-00595-XR |
| | § | |
| INEOS  USA  OIL  &  GAS,  L.L.C., | § | |
| CHESAPEAKE EXPLORATION, L.L.C., | § | |
| *Defendants* | § | |

## ORDER ON CROSS-MOTIONS FOR
## PARTIAL SUMMARY JUDGMENT

On this date, the Court considered Plaintiff Gringita, Ltd.'s Motion for Partial Summary Judgment (ECF No. 31); Defendants Ineos USA Oil & Gas, L.L.C. and Chesapeake Exploration, L.L.C.'s Cross-Motion for Partial Summary Judgment (ECF No. 38); and the briefing associated with both Motions (ECF Nos. 39, 40, 42).  After careful consideration, Gringita's Motion is **GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion is **DENIED**.

### BACKGROUND

Plaintiff Gringita, Ltd. owns 1,014.76 acres of land in Dimmit County, Texas.  ECF No. 31 at 2, 72, 77.  It signed a mineral lease on the land (the "Lease") with Defendant Chesapeake Exploration, L.L.C., who later assigned its interest to Defendant Ineos USA Oil & Gas, L.L.C. ECF No. 31 at 13.  Gringita retained a royalty interest.

Gringita sued, alleging in relevant part that Defendants deducted post-production costs—i.e., costs for things like transporting and processing oil and gas extracted under the lease—from Gringita's royalty payments.  Gringita argues that the Lease does not allow such deductions and instead requires Defendants to bear all post-production costs.

1

Section 3.A of the Lease provides that "Lessee shall pay to Lessor, Lessor's Royalty Share."  ECF No. 31 at 15.  The same section defines "Royalty Share" as:

Twenty-five (25%) of all sums and amounts of money, including but not limited to any reimbursement for post production costs, bonuses, premiums, and all other benefits in cash, kind or otherwise, derived, received or realized by, or to inure to the benefit of, Lessee, directly or indirectly, from contribution, disposition, settlement, exchange, sale, severance, swap, buy-out, buy-back, balancing agreement, payable or deliverable to Lessor as royalty, but not as a bonus, within sixty (60) days from and after the final consummation of each such contribution, disposition, settlement, exchange, sale, severance, swap, buy-out, buy-back, balancing agreement.

ECF No. 31 at 15–16.

The Lease then defines several terms.  *See* ECF No. 31 at 16.  Most notably, Section 3.C and 3.E define "Gross Proceeds" for oil and gas respectively.  The two provisions differ slightly, so the Court will reproduce them separately.  Section 3.C provides that

"Gross Proceeds" as used herein shall mean *the total proceeds* received by Lessee *for any sale* of Oil and condensate; provided however, *if any contract* covering Oil Produced from the lands covered hereby, or any contract used for the purpose of establishing the price of Lessor's royalty Oil, *provides for any deduction for the expenses of* production (except for Lessor's proportionate share of actual costs of extricating the sulphur (if any) from the oil and shrinkage (if any) resulting from such extricating), *post production*, gathering, dehydration, compression, transportation, manufacturing, processing, treating, or marketing of such Oil, *then such deduction shall be added to the price received by Lessee* for such Oil *so that Lessor's Royalty Share shall not be charged directly or indirectly with any such expenses.*

*Id.* (emphasis added).  Section 3.E similarly provides that

"Gross Proceeds" as used herein shall mean *the total proceeds* received by Lessee *for any sale* of such Gas provided, however, *if any contract* covering Gas produced from the lands covered hereby, or any contract used for the purpose of establishing the price of Lessor's royalty Gas, *provides for any deduction for the expenses of* production (except for Lessor's proportionate share of actual costs of extricating the sulphur (if any) from the gas and shrinkage (if any) resulting from such extricating), *post production*, gathering, dehydration, compression, transportation, manufacturing, processing, treating, line loss or marketing of such Gas, *then such deduction shall be added to the price received by Lessee* for such Gas *so that Lessor's Royalty Share shall not be charged directly or indirectly with any such*

*expenses.*  Provided however, should said gas contract provide for a deduction for transportation or shrinkage downstream from Lessee's sales meter, and such deduction be levied by a bona fide non-affiliated third party, then in such event, Lessor's Royalty Share shall bear its proportionate share of deductions, and as such be considered a component of Gross Proceeds; but *no other post production costs shall be deducted from Lessor's Royalty Share.*

*Id.* (emphasis added).  Despite these definitions' presence in the Lease, the phrase "Gross Proceeds" does not appear capitalized anywhere else in the lease, and it does not appear at all in the rest of Section 3, which defines the royalty interest.

Sections 3.B and 3.D define "Fair Market Value" as "the price paid to Lessee by a non-affiliated or non-related third party for" oil/gas "produced from the Leased Premises."  ECF No. 31 at 16.  As to gas, Section 3.D adds that "[n]o other deduction other than unreimbursed severance tax actually paid by Lessee, and Lessor's proportionate share of costs to extract sulphur (if any) and share of shrinkage (if any) therefrom, are to be made."  *Id.*  Like the phrase "Gross Proceeds," the phrase "Fair Market Value" is not used in any part of the lease in a way that directly affects the royalty.  Its only appearance outside of the paragraphs defining it is in Section 3.K, which simply provides that the "quantification of" a certain benefit "shall not affect the Fair Market Value provisions of this lease."  ECF No. 31 at 21.

Another relevant lease provision is Section 3.I, which provides:

The royalties provided herein shall be determined and delivered to Lessor free of any development, production, post production, gathering, separating, storing, dehydration, treating, compression, processing, recycling fuel for natural gas processing plants, marketing, manufacturing, transportation, delivery, or like costs, except as specifically provided for in this Lease, except, however, taxes applicable to Lessor's share of production which are actually paid by Lessee, or deducted by the purchaser of production, and are not reimbursed or refunded to the Lessee.  It is further agreed that Lessor's Royalty Share shall never bear, either directly or indirectly, any part of the costs of construction, operation or depreciation of any plants or other facilities or equipment for processing or treating said Oil or Gas produced from the herein Leased Premises.  Notwithstanding anything to the contrary, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share

3

of production so long as they are based on Lessee's actual cost of such enhancements.  In this manner, Lessor's royalty shall never be based on a price less than the price that would have been received without the cost of such enhancements.  This paragraph shall apply to all royalties paid notwithstanding the decision in *Heritage Resources, Inc., v. NationsBank*, 939 S.W.2d 118, (Tex. 1996).

ECF No. 31 at 20.

Gringita moves for partial summary judgment based on these provisions.  It asks the Court to declare that: (1) the Lease generally prohibits Defendants from deducting post-production costs from Gringita's royalty; (2) "the Lease requires Defendants to add back any deductions for post-production costs to the price received before calculating Plaintiff's royalty;" and (3) "Plaintiff is entitled to a partial release from the Defendants under the terms of the lease."  ECF No. 31 at 10.  Defendants cross-moved for summary judgment, arguing that the lease generally allows them to deduct post-production costs from Gringita's royalty and that Gringita's claim based on alleged post-production-cost deductions must be dismissed.  ECF No. 38 at 20.  Both motions are ripe for review.  ECF Nos. 31, 38, 39, 40, 42.

## DISCUSSION

### I.         Summary Judgment Standard

To be entitled to summary judgment, a movant must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  FED. R. CIV. P. 56. The movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense.  *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show summary judgment is inappropriate. *See Fields v. City of S. Hou.*, 922 F.2d 1183, 1187 (5th Cir. 1991). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Nor is a mere "scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, it must be satisfied that no reasonable trier of fact could find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and it must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

"On cross-motions for summary judgment, [courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010).

## II.     Rules of Construction

Courts apply "[t]he standard rules of contract construction" when interpreting a mineral lease. *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 202–203 (Tex. 2019); *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021).[1]  A court must "construe the [document] as a whole to ascertain the parties' intent and attempt to harmonize provisions so none are rendered meaningless." *Fasken Oil & Ranch, Ltd. v. Puig*, No. 24-1033, 2026 WL 969268, at \*2 (Tex. Apr. 10, 2026).  Terms are given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Burlington*, 573 S.W.3d at 203.

## III.     Analysis

A "royalty interest" is "the right to receive a share of gross production of the minerals produced under a mineral lease." *Hoffman v. Thomson*, No. 04-19-00771-CV, 2026 WL 758737, at \*1 (Tex. App.—San Antonio Mar. 18, 2026, no pet. h.).  "Usually, the landowners' royalty is free of the expenses incurred to bring minerals to the surface (production costs)" but is subject to its proportionate share of "expenses incurred thereafter to make production marketable (postproduction costs)." *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 336 (Tex. 2023).  "As in most situations, 'the parties may modify this general rule by agreement.'" *Burlington*, 573 S.W.3d at 203 (quoting *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 872 (Tex. 2016)).  In determining whether they have done so, past "decisions interpreting royalty

---

[1] The parties agree that Texas substantive law governs in this case.  ECF No. 31 at 4; ECF No. 38 at 8.

agreements serve as informative guides." *Id.* at 200. But "the decisive factor in each case is the language chosen by the parties to express their agreement." *Id.*

As laid out below, the Lease here provides a royalty interest that is generally free of post-production costs. The lease also requires that if a purchaser deducts expenses for post-production costs from the price it pays to the producer, that deduction must be added to the royalty base "so that [Gringita's] Royalty Share shall not be charged directly or indirectly with any such expenses." ECF No. 31 at 16.

    a.   The Royalty Is Generally Free of Post-Production Costs

Under Section 3.A, Gringita's "Royalty Share" is twenty-five percent

> of all sums and amounts of money, including but not limited to any reimbursement for post production costs, bonuses, premiums, and all other benefits in cash, kind or otherwise, derived, received or realized by, or to inure to the benefit of, Lessee, directly or indirectly, from contribution, disposition, settlement, exchange, sale, severance, swap, buy-out, buy-back, balancing agreement.

ECF No. 31 at 15–16. A royalty clause that is—like this one—"based solely on the price actually received" is generally "sufficient in itself to excuse the [royalty holder] from bearing postproduction costs."[2]

Beyond that, Section 3.A is notably broad. It does not just provide for a royalty based on the amount realized from sales. It entitles Gringita to a portion of "*all* sums and amounts of money, including . . . benefits in cash, *kind or otherwise*, derived, received or realized by, *or to inure to the benefit of*, Lessee, directly *or indirectly*," not just from sales but also from, e.g., "exchange" or "swap." ECF No. 31 at 15–16 (emphasis added); *In Kind*, BLACK'S LAW DICTIONARY (12th ed.

---

[2] *BlueStone*, 620 S.W.3d at 390; *see also Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 417 (5th Cir. 2014) ("Had the lease provided only that the Warrens are to receive 22.5% of the amount realized by Lessee, there would be little question that the Warrens would be entitled to 22.5% of the sales contract price that the lessee received, with no deduction of post-production costs."); *Burlington*, 573 S.W.3d at 205 ("Viewed in isolation," a clause measuring a royalty based on "the amount realized" from sales "provides considerable support for th[e] position" that the royalty is "free of post-production costs." (Citing *Warren*, 759 F.3d at 417)).

2024) (defining "in kind" to mean "[i]n goods or services rather than money").  Because it bases the royalty on the price actually received by the lessee, and because of its broad language, Section 3.A provides for a royalty interest that is generally free of post-production costs.

The Lease also allows Gringita, "in its sole discretion," to take its royalty "in kind," ECF No. 31 at 19–20, meaning it can take possession of its share of the minerals rather than being paid a portion of their value, *Fasken*, 2026 WL 969268, at *6 n.44.  If it were to take its royalty in kind, the lessee would have to "immediately provide to Lessor all accurate, safe and suitable means and facilities to measure, store and deliver each type of Mineral in a fully marketable condition, with no costs or deductions of any kind, and with no hindrance of any kind to Lessor."  ECF No. 31 at 20 (also stating that "[a]ny compression, transportation, or other marketing costs, which would not be borne by Lessor's Royalty Share of Gas, shall not be charged to Lessor when taking its Gas in kind").  That is to say, the lessee would have to pay post-production costs.  "[I]t would be strange for parties to contract for the value of the royalty to turn on the method of delivery." *Fasken*, 2026 WL 969268, at *6.  And while "[p]arties are free to contract for odd results," a court should "not reach to find them outside the text of the deed."  *Id.* (cleaned up).

Section 3.I also confirms that Gringita's royalty is generally free from post-production costs.  To start, it says that

> [t]he royalties provided [in the lease] shall be determined and delivered to Lessor *free of* any development, production, *post production*, gathering, separating, storing, dehydration, treating, compression, processing, recycling fuel for natural gas processing plants, marketing, manufacturing, transportation, delivery, or like *costs*, except as specifically provided for in this Lease, except, however, taxes applicable to Lessor's share of production which are actually paid by Lessee, or deducted by the purchaser of production, and are not reimbursed or refunded to the Lessee."

ECF No. 31 at 20 (emphasis added).  That sentence ("Sentence 1") is clear that the royalty is "free of . . . post[-]production . . . costs," except as otherwise provided by the Lease.  *Id.*

8

The next sentence ("Sentence 2") provides that "Lessor's Royalty Share shall never bear, either directly or indirectly, any part of the costs of construction, operation or depreciation of any plants or other facilities or equipment for processing or treating said Oil or Gas produced from the herein Leased Premises." *Id.*

Then comes the sentence that Defendants rely on ("Sentence 3"): "Notwithstanding anything to the contrary, any *such costs* which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements." *Id.* (emphasis added). Defendants argue that the phrase "such costs" refers to *all* costs referenced in Section 3.I. So, Defendants say, the royalty is subject to post-production costs "*unless* the post-production costs do not enhance the value of marketable oil and gas production." ECF No. 38 at 10 (emphasis in original). On this reading, the Lease creates a "modified version of a net proceeds royalty." *Id.*

Gringita counters that "such costs" refers only to the costs listed in Sentence 2—that is, costs for "construction, operation or depreciation of any plants or other facilities or equipment for processing or treating said Oil or Gas produced from the herein Leased Premises."

Gringita's interpretation is the better one. As noted above, royalties are generally free of production costs but subject to post-production costs. *E.g.*, *Burlington*, 573 S.W.3d at 203. At least absent Sentence 3, the Lease unambiguously departs from that general rule for the reasons already stated.

Despite that, Defendants argue, right after explicitly saying that the royalty is "*free* of any . . . post[-]production . . . costs" the drafters completely changed the interest, returned to the more typical approach that they had just disclaimed, and rendered the royalty *subject* to the considerable majority of post-production costs. *See Devon*, 668 S.W.3d at 336 (noting that

9

post-production costs "generally make production more valuable"); *Burlington*, 573 S.W.3d at 203 ("Products on which post-production costs have been expended are generally more valuable than products straight out of the well."). In fact, under Defendants' reading, the royalty would likely also be subject to most *production* costs. *See* ECF No. 31 at 20 (listing production, as well as post-production, costs in Sentence 1). Further, Defendants would have the Court hold that the drafters did all of this in one sentence near the bottom of a section titled "ROYALTY – *FREE OF COST*." ECF No. 31 at 20 (emphasis added). That seems unlikely.

Still, if that were the only reasonable reading, it would control. But it is not. Gringita argues that "such costs" in Sentence 3 refers to the immediately prior use of the word "costs," in Sentence 2. So, Gringita argues, under Sentence 1, the royalty interest is generally free of post-production costs. Under Sentence 2, it is free of "costs of construction, operation or depreciation of any plants or other facilities or equipment for processing or treating . . . Oil or Gas produced from the . . . Leased Premises." And under Sentence 3, those "costs of construction, operation or depreciation" can be deducted from the royalty base if they enhance the marketable minerals' value. Unlike Defendants' reading, this interpretation harmonizes Sentence 3 with the rest of the Lease and avoids undermining the many provisions suggesting that the royalty interest is generally free of post-production costs. It also seems reasonable that the drafters might have struck this bargain, which presumably incentivizes the lessee to invest in its own facilities and equipment in ways that enhance longer-term value for both Gringita and the lessee.

Gringita's royalty interest is generally free of post-production costs.

b. The Lease Requires Defendants to Add Deducted Post-Production Costs to the Royalty Base

Gringita also argues that Defendants must *add* to the royalty base any amount deducted from a sales price to cover post-production costs. The Court agrees.

In *Devon Energy Production, L.P. v. Sheppard*, 668 S.W.3d 332, the Texas Supreme Court considered a similar issue. *Id.* at 338. The lease there provided for a royalty based on gross proceeds—that is, based on "the total monies and other consideration accruing to or paid the Lessee or received by Lessee for disposition or sale" of the minerals. *Id.* at 337 (emphasis omitted).

The lease also included some "more unconventional language." *Id.* Under Section 3(c), if any mineral sale included "any reduction or charge for the expenses or costs of production" or post-production, then "such deduction, expense or cost" had to "be added to . . . gross proceeds so that Lessor's royalty shall never be chargeable directly or indirectly with any costs or expenses" other than its share of certain taxes. *Id.* at 337–38 (ellipsis in original) (emphasis omitted). The lease later restated that the royalty "shall never bear or be charged with, either directly or indirectly, any part of the costs or expenses of production, . . . [or] post-production expenses." *Id.* at 338 (emphasis omitted).

The parties in *Devon* agreed that the producers could not deduct from the royalty base— "directly or indirectly"—"any expenses they incur[red] to ready production for sale." *Id.* As a result, if a buyer "paid a lower price as a cost adjustment for having transported and processed gas on the producers' behalf, the producers . . . added the pre-sale transportation and processing expenses to the stated sales price before computing the landowners' royalty payment." *Id.* That is, if the producers received a lower price because the purchaser handled post-production but pre-sale expenses on the producers' behalf, the producers had to "add back" the value of those expenses to the royalty base. *Id.* Because these post-production expenses were "consideration accruing to the producers' benefit," they were part of the producers' "gross proceeds." *Id.*

The dispute in *Devon* was about whether the lease went further. The royalty holder argued that the producers *also* had to add to the royalty base "the buyer's actual or anticipated costs to

enhance the value of production *after the point of sale.*" *Id.* at 338–39 (emphasis added). The royalty holder characterized this as an "add-to-proceeds" clause; the court called it a "proceeds plus" lease. *Id.* at 339. Essentially, if the producers sold the minerals before incurring certain post-production expenses and charged a lower price explicitly because the purchaser would incur those expenses after the point of sale, then—the royalty holder argued—the reduction in price had to be added to the royalty base. *Id.* at 338–39.

The court agreed with that interpretation. Again, Section 3(c) of the lease required "'any reduction or charge' for postproduction costs that ha[d] been included in the producer's disposition of production to be 'added to' gross proceeds so that the landowners' royalty 'never' b[ore] those costs even 'indirectly.'" *Id.* at 345. That language was not "textually constrained to the expenses incurred by the seller or prior to the point of sale." *Id.* And because the separate requirement that the royalty "be paid on the producers' gross proceeds" already required that deductions for *pre-sale* expenses be added to the royalty base, Section 3(c) would do nothing under the producers' reading. *Id.* Further, the lease "unambiguously contemplate[d] royalty payable on an amount that may exceed the consideration accruing to the producers." *Id.*

As in *Devon*, the royalty here is based on gross proceeds, though the operative language does not include those words. *See* ECF No. 31 at 15–16 (basing Gringita's Royalty Share on "all sums and amounts of money, including but not limited to . . . benefits in . . . kind . . . , derived, received or realized by, or to inure to the benefit of, Lessee, directly or indirectly"); *Devon*, 668 S.W.3d at 344–45 ("Concordant with the common understanding of the term, the [relevant] leases define gross proceeds (for royalty purposes) as the total monies and other consideration accruing to or paid the Lessee or received by Lessee for disposition or sale." (cleaned up)). And like the language in *Devon*, Section 3.A of the Lease here "is not textually constrained to the expenses

12

incurred by the seller or prior to the point of sale." *Devon*, 668 S.W.3d at 345. Rather, it includes "all sums and amounts of money, including but not limited to" "benefits in cash, kind, or otherwise," that are "derived, received or realized by, or to inure to the benefit of" Defendants, "directly or indirectly," including from "exchange" or "swap." ECF No. 31 at 15–16.

Section 3.A does not include language that, like that in *Devon*, makes clear that the drafters intended that the royalty base might sometimes exceed gross proceeds. But Sections 3.C and 3.E do. Those sections define "Gross Proceeds" to mean "total proceeds received by Lessee for a sale." ECF No. 31 at 16. They then specify that "if any contract . . . provides for any deduction for the expense of . . . post production . . . , then such deduction shall be *added to the price received by Lessee . . .* so that Lessor's Royalty Share shall not be charged directly or indirectly with any such expenses." *Id.* (emphasis added). This language is similar to the lease in *Devon*, which, again, read:

> If any disposition, contract or sale . . . shall include *any reduction or charge for the expenses or costs* of [post production], *then such deduction, expense or cost shall be added to . . . gross proceeds* so that Lessor's royalty shall *never be chargeable directly or indirectly with any costs or expenses* other than its pro rata share of severance or production taxes.

668 S.W.3d at 337–38 (emphasis and second ellipsis in original).

Defendants rightly point out that Sections 3.C and 3.E primarily define the term "Gross Proceeds," which is not actually used in a directly operative provision related to the royalty interest. They also point out that the Lease includes unused definitions of "Fair Market Value." And if the definitions of "Fair Market Value" were used to measure the royalty, then it would at least generally be subject to post-production costs. *Compare* ECF No. 31 at 16 (defining "Fair Market Value" to mean "the price paid to Lessee by a non-affiliated or non-related third party for" oil and gas "produced from the Leased Premises") *with Fasken*, 2026 WL 969268, at *4 ("[I]n the

13

absence of language calling for a royalty on transported, processed, treated, or otherwise enhanced minerals downstream, a royalty on minerals 'produced' is a royalty valued at the wellhead."); *BlueStone*, 620 S.W.3d at 390 ("[A]n 'at the well' valuation point functions as a net-proceeds calculation.").

But all of these definitions still provide context. And Sections 3.C and 3.E include language explicitly outlining their intended effect on the Royalty Share. *See* ECF No. 31 at 16 ("[S]uch deduction shall be added to the price received . . . *so that Lessor's Royalty Share shall not be charged directly or indirectly . . . .*"). The definitions of "Fair Market Value" do not include such language. *See id.* And, as described above, even though Section 3.A does not use the phrase "gross proceeds," it unambiguously creates a royalty *based on* gross proceeds. So although Sections 3.C and 3.E do not necessarily apply directly, they inform the Court's interpretation of Section 3.A's broad language.

As such, (1) Gringita's royalty is generally not subject to post-production costs, and (2) the Lease requires Defendants to add to the royalty base the value of any sales-price deductions that are meant to account for post-production costs.

c.  Gringita's Royalty Is Subject to Certain Post-Production Costs

To be clear, Gringita's royalty interest is not free from *all* post-production costs. Rather, the interest is free of post-production costs "except as specifically provided for in [the] Lease." ECF No. 31 at 20. So, for example, taxes can generally be deducted from the royalty base. *Id.* So can "costs of construction, operation or depreciation of any plants or other facilities or equipment for processing or treating" minerals, so long as those costs "result in enhancing the value of the marketable oil, gas or other products to receive a better price." *Id.*

d.   The Court Declines to Rule on Whether Defendants Must Furnish a Release

Gringita's Motion cursorily asks the Court to "[d]eclare that Plaintiff is entitled to a partial release from the Defendants under the terms of the Lease."  ECF No. 31 at 10.

The lessee is, of course, "obligated to pay or cause to be paid the royalties provided for [in the Lease]."  ECF No. 31 at 22.

> If Lessee should fail to make or cause to be made such payments of royalty, Lessor must provide written notice to Lessee . . . of such default and, unless Lessee makes a written bona fide dispute as to such payment of royalties OR takes action to eliminate such default . . . , Lessor may, at Lessor's option, cancel th[e] [L]ease.

ECF No. 31 at 23–24.  If the Lease "expires for any reason as to all or any portion of the land described in th[e] Lease, Lessee and/or its assigns shall be obligated to furnish Lessor with a written, recordable release instrument covering all, or that portion, of said land . . . ."  ECF No. 31 at 26.

Gringita says that it sent a notice of default and that Defendants did not respond.  Gringita purportedly then "canceled" the Lease, which it argues means that the Lease "expired."  As such, Gringita argues, Defendants must furnish a release.  Gringita's Motion did not mention this issue until its conclusion, where it simply asked for a release without analysis or meaningful explanation. *See* ECF No. 31.  It did not develop the argument until its Reply.  ECF No. 39 at 7–8.

This issue was not adequately raised in the Motion, *Wilson v. City of Mission, Tex.*, No. 7:18-CV-00399, 2020 WL 2079359, at *10 (S.D. Tex. Apr. 29, 2020) ("[A]rguments asserted without citation to authority or left undeveloped are waived."), and "[a]rguments cannot be raised for the first time in a reply brief," *Little Tchefuncte River Ass'n v. Artesian Util. Co., Inc.*, 155 F. Supp. 3d 637, 657 (E.D. La. 2015).  So the Court declines to rule on whether the Lease requires a partial release at this time.

15

The Court notes, however, that the relevant provisions only come into play "[i]f Lessee . . . fail[ed] to make or cause to be made" royalty payments. ECF No. 31 at 23–24. The parties disagree about whether underpayment—as opposed to nonpayment—can be grounds for default under the Lease. But even if it can be, Gringita has provided no evidence that Defendants underpaid on the royalty, and Defendants "dispute that they have deducted any costs from Plaintiff's 'Royalty Share.'" ECF No. 38 at 17. So, although the Court declines to rule on this issue because it was not properly raised, summary judgment would likely be improper regardless.

## CONCLUSION

For the foregoing reasons, Gringita's Motion for Summary Judgment (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART**, and Defendants' Cross-Motion for Summary Judgment (ECF No. 38) is **DENIED.**

Gringita's royalty interest is free of post-production costs except as specifically provided for in the Lease. The Lease requires Defendants to add to the royalty base the value of any sales-price deductions that are meant to account for post-production costs. And Gringita's argument that Defendants must furnish a release was not adequately presented, so the Court does not rule on it.

It is so **ORDERED**.

**SIGNED** this 8th day of May, 2026.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

16